ENTER NO JS-6 SEND

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB 2 2 2006

CENTRAL DISTRICT OF C~~~~~~
BY

ENTERED
CLERK, U.S. DISTRICT COURT

FEB 2 4 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| USF INSURANCE COMPANY | ) CASE NO. 05-04138 MMM (RZx) |
| Plaintiff, | ) |
| vs. | ) AMENDED ORDER GRANTING IN<br>) PART AND DENYING IN PART<br>) PLAINTIFF'S MOTION FOR SUMMARY<br>) JUDGMENT; GRANTING IN PART AND |
| CLARENDON AMERICA INSURANCE<br>COMPANY, CLARENDON<br>NATIONAL INSURANCE COMPANY,<br>AND DOES 1 through 20, inclusive, | ) DENYING IN PART DEFENDANTS'<br>) MOTION FOR SUMMARY JUDGMENT<br>)<br>) |
| Defendants. | )<br>) |

This action involves a dispute between insurance carriers regarding their duties in connection with *Alvizuri, et al. v. Fieldstone Communities Inc., et al.*, Orange County Superior Court Case No. 03CC00227 (the "Underlying Action"). In *Alvizuri*, the owners of more than one hundred single-family dwellings sued, *inter alia*, Hondo Construction & Development, Inc. for damages resulting from alleged construction defects. On May 5, 2005, USF Insurance Company filed this action in Los Angeles Superior Court against Clarendon America Institute Company ("Clarendon America") and Clarendon National Insurance Company ("Clarendon National"), alleging that defendants had wrongfully refused to participate in the defense and indemnification of Hondo in the Underlying Action. USF sought (1) a declaration that defendants had a duty to defend Hondo in the Underlying Action; (2) a declaration that defendants had a duty to indemnify

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

52

1   Hondo in the Underlying Action; (3) equitable contribution of an equal share of the defense costs

2   USF paid in the Underlying Action; and (4) a declaration apportioning any indemnity obligation

3   owed by the insurers in connection with the Underlying Action.

4        Defendants removed the action to federal court on June 8, 2005. On October 3, 2005, they

5   filed a motion for summary judgment, or, alternatively, partial summary judgment on USF's first

6   and third causes of action. That same day, USF filed its own motion for summary judgment or

7   partial summary judgment.

8

9                              **I. FACTUAL BACKGROUND**

10  **A.      Underlying Action**

11       *Alvizuri v. Fieldstone Communities Inc.*, the Underlying Action that gives rise to this

12  dispute, was filed in state court on June 20, 2003.[1]  A group of 49 plaintiffs – each of whom

13

---

14       [1]Stipulation of Facts in Support of Cross-Motions for Summary Judgment and/or
    Adjudication ("Fact Stip."), ¶ 1. See Clarendon America Insurance Company's Statement of
15  Uncontroverted Facts in Support of Motion for Summary Judgment or, in the Alternative
    Summary Adjudication ("Defs.' Facts"), ¶ 1; Statement of Genuine Issues in Opposition to
16  Clarendon's Motion for Summary Judgment, or in the Alternative for Summary Adjudication as
17  to Plaintiff's First and Third Causes of Action ("Pl.'s Genuine Issues"), ¶ 1.
18       USF requests that the court take judicial notice of the pleadings in the Underlying Action,
    and defendants do not object. (See Request for Judicial Notice of Pleadings in Underlying Action
19  in Considering the Parties' Cross-Motions for Summary Judgment; Stipulation re Mutual
20  Waiver/Withdrawal of Certain Evidentiary Objections to Documents Offered by Each Side in
    Support of the Cross-Motions for Summary Judgment/Summary Adjudication ("Evid. Stip."),
21  ¶ 3.) The court "may take judicial notice of a document filed in another court not for the truth
22  of the matters asserted in the litigation, but rather to establish the fact of such litigation and related
    filings." *San Luis v. Badgley*, 136 F.Supp.2d 1136, 1146 (E.D. Cal. 2000) (quoting *United*
23  *States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)); see *Goetz v. Capital Factors, Inc.*, 120
24  F.3d 268, 1997 WL 415340, *1-2 (9th Cir. July 22, 1997) (Unpub. Disp.) ("[A]lthough a court
    may take judicial notice of its own records, it cannot take judicial notice of the truth of the
25  contents of all documents found therein"); *Hill v. Goord*, 63 F.Supp.2d 254, 256 (S.D.N.Y.
26  1999) ("It also is entirely proper for this Court to take judicial notice of the actions taken in these
    related proceedings 'to establish the fact of such litigation and related filings,'" citing *Liberty*
27  *Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992), and *Kramer*
    *v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)). Because USF's request is limited to
28  the fact of the pleadings, and not the truth of their contents, the court finds that judicial notice is

1   owned a single-family home in Rancho Santa Margarita, California – sued Fieldstone

2   Communities, Inc. and other developers, designers, and contractors involved in building the

3   houses for alleged design and construction defects.[2]  Plaintiffs alleged that

4       "[a]t the time of the purchase by Plaintiffs, the PROPERTY was defective and unfit

5       for its intended purposes because Defendants did not construct the PROPERTY in

6       a workmanlike manner as manifested by, but not limited to, numerous defects

7       which have resulted in damage to the homes and their component parts.   The

8       defects include, without limitations and to various degrees on the plaintiffs'

9       respective residences, the following:

10          Faulty soil compaction, faulty existing underlying soils and

11          expansive soils resulting in soil movement and damage to the

12          structures; concrete slabs, flatwork and foundation defects; plumbing

13          defects; electrical defects; drainage defects; roof defects; HVAC

14          defects; waterproofing defects; window and door defects;

15          landscaping and irrigation defects; framing, siding and structural

16          defects; ceramic tile, vinyl flooring and countertop defects; drywall

17          defects; fence and retaining wall defects; cabinet and wood trim

18          defects; fireplace and chimney defects; tub and shower door defects;

19

20  _____

21  proper.  (See Declaration of Jeffrey S. Behar in Support of USF Insurance Company's Opposition
    to Clarendon's Motion for Summary Judgment, or in the Alternative, for Summary Adjudication

22  of the Plaintiff's First and Third Causes of Action ("Behar Decl."), Exh. O (*Alvizuri v. Fieldstone
    Communities Inc.*, Complaint for Damages, filed June 20, 2003), Exh. P (First Amended

23  Complaint for Damages, filed July 21, 2003), Exh. Q (Second Amended Complaint for Damages,
    filed September 8, 2003), Exh. R (Third Amended Complaint for Damages, filed Nov. 26, 2003),

24  Exh. S (Fourth Amended Complaint for Damages, filed January 22, 2004); Exh. T (Fifth

25  Amended Complaint for Damages, filed March 2, 2004).)

26      [2]Behar Decl., Exh. O (Complaint for Damages, ¶¶ 1-9), Exh. P (First Amended Complaint

27  for Damages, ¶¶ 1-9), Exh. Q (Second Amended Complaint for Damages, ¶¶ 1-9), Exh. R (Third
    Amended Complaint for Damages, ¶¶ 1-9), Exh. S (Fourth Amended Complaint for Damages,

28  ¶¶ 1-9), Exh. T (Fifth Amended Complaint for Damages, ¶¶ 1-9).

1    painting defects; sheet metal defects; and stucco defects."[3]

2    Plaintiffs asserted that these defects were not apparent by reasonable inspection of the property

3    at the time of purchase, and that it was only afterwards that "[t]he defects . . . manifested."[4]

4    They alleged that they had become aware of the defects only within the prior three years, and that

5    they had given the developers timely notice of the defects upon discovery.[5]

6         Based on these allegations, plaintiffs asserted claims for strict products liability, breach of

7    implied warranty, breach of express warranty, breach of contract, negligence, and negligence per

8    se.[6] They prayed for (1) costs of restoration and repairs to the homes in excess of $150,000 per

9    home; (2) costs of investigation; (3) damages for diminution of value of the property;

10   (4) attorneys' fees, expert fees, and costs of suit; (5) damages for loss of use of the property and

11   relocation expenses; and (6) other appropriate relief.[7]

12        The complaint was amended multiple times after June 20, 2003 to join more plaintiffs.

13

──────────────────

14      [3]*Id.*, Exh. O (Complaint for Damages, ¶ 15), Exh. P (First Amended Complaint for
15   Damages, ¶ 15), Exh. Q (Second Amended Complaint for Damages, ¶ 15), Exh. R (Third
     Amended Complaint for Damages, ¶ 15), Exh. S (Fourth Amended Complaint for Damages,
16   ¶ 15), Exh. T (Fifth Amended Complaint for Damages, ¶ 15).

17      [4]*Id.*, Exh. O (Complaint for Damages, ¶ 18), Exh. P (First Amended Complaint for
18   Damages, ¶ 18), Exh. Q (Second Amended Complaint for Damages, ¶ 18), Exh. R (Third
     Amended Complaint for Damages, ¶ 18), Exh. S (Fourth Amended Complaint for Damages,
19   ¶ 18), Exh. T (Fifth Amended Complaint for Damages, ¶ 18).

20      [5]*Id.*, Exh. O (Complaint for Damages, ¶ 17), Exh. P (First Amended Complaint for
21   Damages, ¶ 17), Exh. Q (Second Amended Complaint for Damages, ¶ 17), Exh. R (Third
     Amended Complaint for Damages, ¶ 17), Exh. S (Fourth Amended Complaint for Damages,
22   ¶ 17), Exh. T (Fifth Amended Complaint for Damages, ¶ 17).

23      [6]*Id.*, Exh. O (Complaint for Damages, ¶¶ 10–54), Exh. P (First Amended Complaint for
24   Damages, ¶ 18), Exh. Q (Second Amended Complaint for Damages, ¶¶ 10–54), Exh. R (Third
     Amended Complaint for Damages, ¶¶ 10–54), Exh. S (Fourth Amended Complaint for Damages,
25   ¶¶ 10–54), Exh. T (Fifth Amended Complaint for Damages, ¶¶ 10–54).

26      [7]*Id.*, Exh. O (Complaint for Damages at 11-12), Exh. P (First Amended Complaint for
27   Damages at 15), Exh. Q (Second Amended Complaint for Damages at 15), Exh. R (Third
     Amended Complaint for Damages at 16), Exh. S (Fourth Amended Complaint for Damages at
28   16), Exh. T (Fifth Amended Complaint for Damages at 16).

1    The fifth amended complaint, filed March 4, 2004, was the final operative pleading.[8]  It alleged

2    that 127 single-family homes in Rancho Santa Margarita were defective.[9]

3          The complaint and amended complaints asserted claims for negligence and negligence per

4    se against Hondo,[10] which had framed, or performed rough carpentry on, 90 of the 127 homes.[11]

5    Plaintiffs alleged that defendants' carelessness and negligence in performing the construction

6    work, as well as their failure to comply with applicable building codes, proximately caused the

---

9      [8]Defs.' Facts, ¶ 2; Pl.'s Genuine Issues, ¶ 2.

11     [9]See Behar Decl., Exh. T (Fifth Amended Complaint for Damages).

12     [10]Hondo was not named as a defendant in the original complaint or the subsequent
       amendments.  On December 10, 2003, however, the named defendants filed a cross-complaint
13     against other entities that had participated in constructing the Rancho Santa Margarita homes,
       including Hondo.  (See Declaration of Jon T. Moseley ("Moseley Decl."), Exh. B (Cross-
14     Complaint of Fieldstone Communities, Inc., The Fieldstone Company, Fieldstone Trabuco
       Partners, Rancho Trabuco Partners I, L.P., Rancho Trabuco Partners II, L.P. and Rancho
15     Trabuco III, L.P., filed Dec. 10, 2003).)  On April 23, 2004, plaintiffs amended their complaint
       to name Hondo as "Doe 235."  (See Moseley Decl., Exh. C (Doe Amendment, filed Apr. 23,
16     2004).)  As "Doe 235," Hondo was considered a "Contractor Defendant," as that term was
       defined in the complaint and amendments.  (See, e.g., Behar Decl., Exh. T (Fifth Amended
17     Complaint for Damages, ¶ 8 ("In order to build and construct said project the DEVELOPER
       DEFENDANTS hired, retained, employed, or contracted with persons or entities to provide for
18     labor and materials in the construction of the PROPERTY and project(s).  The identities of said
       persons or entities, whether individual, corporate, or otherwise, sued herein as Does 201 through
19     300 are presently unknown to Plaintiffs who therefore sue such persons by their fictitious names.
       Plaintiffs are informed and believe and thereon allege that said persons or entities are wholly or
20     in some part responsible for the occurrences set for[th] in the Complaint.  These Defendants will
       hereinafter be referred to as the 'CONTRACTOR DEFENDANTS'").)

24     [11]Fact Stip., ¶ 10; see Supplemental Stipulation of Facts in Support of Cross-Motions for
       Summary Judgment and/or Adjudication ("Supp. Fact Stip."), ¶¶ 2, 3, Exh. 1 (listing the 90
25     homes included in the Underlying Action for which Hondo performed framing work); see also
       Defs.' Facts, ¶ 9; Pl.'s Genuine Issues, ¶ 9; Separate Statement of Uncontroverted Facts in
26     Support of USF Insurance Company's Motion for Summary Judgment, or in the Alternative
       Summary Adjudication ("Pl.'s Facts"), ¶ 5.0; Clarendon America Insurance Company and
27     Clarendon National Insurance Company's Statement of Genuine Issues in Support of Opposition
28     to USF's Motion for Summary Judgment/Adjudication ("Defs.' Genuine Issues"), ¶ 5.0.

1    defects and other unspecified damage to their property.[12]  It is undisputed that the homes included

2    in the action had Notice of Completion dates ranging from July 22, 1993 to July 29, 1997.[13]

3    Hondo completed its work on the houses in or before July 1997.[14]

4         The Underlying Action also included "claims based in whole or in part upon earth

5    movement."[15]  Plaintiffs' geotechnical experts alleged that eight of the houses on which Hondo

6    had worked showed signs of damage from soil movement.[16]  It is undisputed that it rained several

7    times, and that more than twelve inches fell, in Rancho Santa Margarita from June 1997 through

8    March 1999.[17]

9    **B.    Insurance Carriers**

10        All of the parties to this suit issued commercial general liability ("CGL") policies naming

11   Hondo as the insured.[18]  USF insured Hondo from July 15, 1988 through July 15, 1999, on policy

12   form USF-OCCUR (Ed. 12/97, Rev. 6/98) (the "USF Policy").[19]  Clarendon National issued a

13   CGL policy to Hondo for the period from April 13 to July 15, 2000, on policy form OCC1-17

---

17   [12]Behar Decl., Exh. O (Complaint for Damages, ¶¶ 39-43, ¶¶ 44-47), Exh. P (First
18   Amended Complaint for Damages, ¶¶ 39-43, ¶¶ 44-47), Exh. Q (Second Amended Complaint
     for Damages, ¶¶ 39-43, ¶¶ 44-47), Exh. R (Third Amended Complaint for Damages, ¶¶ 39-43,
19   ¶¶ 44-47), Exh. S (Fourth Amended Complaint for Damages, ¶¶ 39-43, ¶¶ 44-47), Exh. T (Fifth
     Amended Complaint for Damages, ¶¶ 39-43, ¶¶ 44-47).

20
21   [13]Fact Stip., ¶ 11; see Defs.' Facts, ¶ 10; Pl.'s Genuine Issues, ¶ 10.

22   [14]Fact Stip., ¶ 12; see Defs.' Facts, ¶ 11; Pl.'s Genuine Issues, ¶ 11.

23   [15]Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

24   [16]Fact Stip., ¶ 17; see Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

25   [17]Fact Stip., ¶ 18; see Defs.' Facts, ¶ 18; Pl.'s Genuine Issues, ¶ 18.

26   [18]Fact Stip., ¶ 3; see Defs.' Facts, ¶ 3; Pl.'s Genuine Issues, ¶ 3.

27   [19]Fact Stip., ¶¶ 3(A), 5, Exh. 4 (USF Policy); see Defs.' Facts, ¶ 3(A); Pl.'s Genuine
28   Issues, ¶ 3(A); Pl.'s Facts, ¶ 1.0; Defs.' Genuine Issues, ¶ 1.0.

1    (Ed. 09/01/01, Rev. 6/15/96) (the "Clarendon National Policy").[20] Clarendon America issued

2    a CGL policy to Hondo with effective dates of July 15, 2000 through July 15, 2001, on policy

3    form OCC1-17 (Ed. 09/01/01, Rev. 6/15/96) (the "Clarendon America Policy").[21]

4         Prior to the issuance of USF's policy, Hondo was insured by Golden Bear Insurance

5    Company (the "Golden Bear Policy"). The Golden Bear Policy was effective July 15, 1995

6    through July 15, 1996, and was written on policy form CL 100 (11-85) CG 00 01 11 85.[22] The

7    carriers that issued policies that were effective between the expiration of the Golden Bear Policy

8    and the inception of USF's first Policy are presently in liquidation and/or are insolvent.[23]

9         USF and Golden Bear defended Hondo in the Underlying Action, and funded a settlement

10    on its behalf.[24] Hondo's defense and indemnity were tendered to Clarendon America on February

11    2, 2004,[25] via a tender letter that enclosed a copy of the third amended complaint, the developers'

12

---

13      [20]Fact Stip., ¶ 3(B) (modified by Joint Notice of Errata to Stipulation of Facts in Support
14 of Cross-Motions for Summary Judgment and/or Adjudication); see *id.*, ¶ 5, Exh. 5 (Clarendon
National Policy);see also Defs.' Facts, ¶ 3(B); Pl.'s Genuine Issues, ¶ 3(B); Pl.'s Facts, ¶ 2.0;
15 Defs.' Genuine Issues, ¶ 2.0. Clarendon National did not technically issue a policy to Hondo;
16 rather, it issued a cut-through endorsement that was made part of the Hondo policy (Policy No.
GLA 1253810) issued by United Capitol Insurance Company ("United Capitol"). This policy
17 provided that Clarendon National would assume Hondo's coverage in the event United Capitol
was liquidated. Because United Capitol is currently in the process of liquidation, Clarendon
18 National is the effective liability carrier for Hondo for the period April 13 through July 15, 2000.
19 (Fact Stip., ¶ 3(B), n. 2.)

20      [21]Fact Stip., ¶¶ 3(C), 5, Exh. 6 (Clarendon America Policy); see Defs.' Facts, ¶ 3(C);
Pl.'s Genuine Issues, ¶ 3(C); Pl.'s Facts, ¶ 3.0; Defs.' Genuine Issues, ¶ 3.0.
21

22      [22]Fact Stip., ¶¶ 4, 5, Exh. 3 (Golden Bear Policy); see Defs.' Facts, ¶ 4; Pl.'s Genuine
Issues, ¶ 4.
23

     [23]Fact Stip., ¶ 4; see Defs.' Facts, ¶ 4; Pl.'s Genuine Issues, ¶ 4.
24

25      [24]Fact Stip., ¶ 13; see Defs.' Facts, ¶ 12; Pl.'s Genuine Issues, ¶ 12.

26      [25]Pl.'s Facts, ¶ 8.0; Defs.' Genuine Issues, ¶ 8.0. USF asserts that the defense and
indemnity of Hondo were tendered both to Clarendon America and Clarendon National in
27 February 2004. The supporting declaration proffered, however, shows that the tender was made
only to Clarendon America. (See Moseley Decl., ¶ 8, Exh. D (Feb. 2, 2004 Letter from Ford,
28 Walker, Haggerty & Behar to Claim Manager, Clarendon America, re: *Alvizuri v. Fieldstone*

1  cross-complaint, and Hondo's answer to the cross-complaint.[26]  The letter also enclosed a

2  homeowner matrix, which showed Notices of Completion on plaintiffs' homes with dates ranging

3  from September 1993 to December 1998.[27] Clarendon National and Clarendon America declined

4  to defend or indemnify Hondo on July 30, 2004, and confirmed their position on December 30,

5  2004.[28]  When the parties in the Underlying Action reached a settlement, defendants refused to

6

_____

7  *Communities* ("Tender Letter")); see *id.*, ¶ 2 (stating that Ford, Walker, Haggerty & Behar was
8  retained by USF to defend Hondo in the Underlying Action).)

9  [26]*Id.*, Exh. D at 69 (Tender Letter); see also *id.*, Exh. E (July 30, 2004 Letter from
   Kenneth A. Hearn, Hamrick & Evans, LLP to Jon T. Moseley, Esq., Ford, Walker, Haggerty
10  & Behar re: *Eduardo Alvizuri, et al. v. Fieldstone Communities, Inc., etc., et al.* ("July 30, 2004
11  Response to Tender Letter").).

12  [27]*Id.*, Exh. D at 70 (Tender Letter); Exh. E (July 30, 2004 Response to Tender Letter)
   (stating that an independent investigation conducted by North American Risk Services, Inc.,
13  defendants' third-party administrator, showed that Hondo furnished rough carpentry and framing
14  services for plaintiffs' homes under contracts signed between May 1993 and the end of April or
   beginning of May 1997).

15
16  [28]Pl.'s Facts, ¶ 8.1; Defs.' Genuine Issues, ¶ 8.1.  The July 30, 2004 letter gave the
   following reasons for the denial of defense and indemnity: (1) because the Clarendon National and
17  Clarendon America Policies "expressly make[ ] clear each carrier's duty to defend *any* insured
   contingent on the absence of any other insurance policy obligated to do so," the fact that Hondo
18  was already being defended by other liability carriers "eliminat[ed] the conditions necessary . . .
19  to trigger any duty to defend"; (2) "to the extent any covered 'property damage' arising from
   Hondo's work first occurred prior to the inception of either the Clarendon Policy or UC Policy,
20  neither Clarendon America[ ] [nor] Clarendon National would have any obligation to indemnify
   for such damages, consistent with the express language of the policies"; and (3) "under the
21  Absolute Earth Movement Exclusion cited above, if Plaintiffs' damages were caused in whole or
22  in part by any 'earth movement,' as that term is defined, neither policy would have any obligation
   to defend or indemnify Hondo." (Moseley Decl., Exh. E at 77-78 (July 30, 2004 Response to
23  Tender Letter).)  Defendants' agent also cited the contractual liability exclusion, "damage to your
   work" exclusion, and "damage to impaired property" exclusion in the Policies as a basis for
24  denying coverage. (*Id.*, Exh. E at 75-77).
25  Defendants confirmed their initial position on December 30, 2004. (*Id.*, Exh. F at 80
   (Dec. 30, 2004 Letter from Kenneth A. Hearn, Hamrick & Evans, LLP to Jon T. Moseley, Esq.,
26  Ford, Walker, Haggerty & Behar re: *Eduardo Alvizuri, et al. v. Fieldstone Communities, Inc.,
27  etc., et al.* ("First of all, Clarendon National's and Clarendon America's previously expressed
   position on the duty to defend has never changed since my July 30 correspondence. . . .
28  Secondly, with respect to the proposed settlement, I had earlier indicated that, to the extent

1  fund any part of the settlement on Hondo's behalf.[29]

2        USF incurred a total of $117,429.81 in attorneys' fees, costs, and expert fees defending

3  Hondo in the Underlying Action.[30]  Hondo's portion of the settlement was $225,000.00, or

4  $2,500.00 per home for the 90 homes it framed.[31] USF funded 58.35 percent of this amount, or

5  $131,287.50, while Golden Bear funded 41.65 percent, or $93,712.50.[32]

6        **C.    Language Of The Policies**

7        The USF, Clarendon National, and Clarendon America Policies have nearly identical

8  insuring language.[33] All three provide:

9        "**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

10       1.     INSURING AGREEMENT

11       a.     **We** will pay those sums that an **insured** becomes legally obligated to pay as

12              damages for **bodily injury** or **property damage** to which this insurance

13              applies. **We** will have the right and duty to defend any **suit** seeking those

14              damages. However, **we** will have no duty to defend the **insured** against any

15              **suit** seeking damages for **bodily injury** or **property damage** to which this

16

17  _____

18  covered 'property damage' arising from Hondo's work did not first occur during the Clarendon
    policy or the United Capitol policy, neither Clarendon America or Clarendon National would have
    any obligation to indemnify for such damages, consistent with the express language of the
19  policies").)

20       [29]Fact Stip., ¶ 13, ¶ 14; see Defs.' Facts, ¶ 13; Pl.'s Genuine Issues, ¶ 13.

21
22       [30]Pl.'s Facts, ¶¶ 6.0-6.3 (stating that USF paid defense fees of $34,246.50, costs of
    $7,214.62, and $75,968.69 in expert fees, for a total of $117,429.81); Defs.' Genuine Issues,
23  ¶¶ 6.0-6.3 ("[A]ccording to Defendants' information, USF incurred a total of $117,429.81 in
    defense fees and costs on behalf of Hondo in connection with the Underlying Action"); see also
24  Defs.' Facts, ¶ 16(A); Pl.'s Genuine Issues, ¶ 16(A).

25       [31]Fact Stip., ¶ 15; see Defs.' Facts, ¶ 14; Pl.'s Genuine Issues, ¶ 14.

26       [32]Fact Stip., ¶ 15; see Defs.' Facts, ¶ 14; Pl.'s Genuine Issues, ¶ 14; Pl.'s Facts, ¶ 7.0;
27  Defs.' Genuine Issues, ¶ 7.0.

28       [33]Pl.'s Facts, ¶ 4.0; Defs.' Genuine Issues, ¶ 4.0.

1    insurance does not apply.  **We may, at our** sole discretion investigate any

2    **occurrence** and settle any claim or **suit** that may result. . . .

3    (4)    **Our** duty to defend is excess over and shall not contribute

4    where the **insured** has any other insurance under which, but

5    for the existence of this Policy, any other insurer is obligated

6    to provide a defense.

7    b.    This insurance applies to **bodily injury** and **property damage** only if:. . .

8    (1)    The **bodily injury** or **property damage** is caused by an

9    **occurrence** which takes place in the **coverage territory**; and

10    (2)    The **bodily injury** or **property damage** is caused by an

11    **occurrence** which takes place during the policy period

12    whether such **occurrence** is known to the **Insured**; and

13    (3)    The **bodily injury** or **property damage** resulting from such

14    **occurrence** first takes place during the policy period.

15    c.    All **property damage** or **bodily injury** arising from, caused by or

16    contributed to by, or in consequence of an **occurrence** shall be deemed to

17    take place at the time of the first such damage, even though the nature and

18    extent of such damage or injury may change and even though the damage

19    may be continuous, progressive, cumulative, changing or evolving, and

20    even though the **occurrence** causing such **bodily injury** or **property**

21    **damage** may be continuous or repeated exposure to substantially the same

22    general harm."[34]

23 The USF, Clarendon National, and Clarendon America Policies define the terms "property

24 damage" and "occurrence" identically.  "Property damage" is "[p]hysical injury to tangible

25 property including all resulting loss of use of that property"' "[a]ll . . . loss of use shall be

---

27 [34]Fact Stip., ¶ 6, Exh. 4 at 3 (USF Policy), Exh. 5 at 3 (Clarendon National Policy), Exh.
6 at 3 (Clarendon America Policy); see Defs.' Facts, ¶¶ 5, 7; Pl.'s Genuine Issues, ¶¶ 5, 7; Pl.'s
28 Facts, ¶¶ 11.1, 11.2; Defs.' Genuine Issues, ¶¶ 11.1, 11.2.

deemed to occur at the time of the physical injury that caused it."[35] An "occurrence" is "[a]n accident, including continuous or repeated exposure to substantially the same general harm."[36]

All three Policies also contain an identical Absolute Earth Movement Exclusion, which excludes from coverage:

"**Bodily injury or property damage** claimed, in whole or in part, to arise from or be aggravated by, or claimed to result from or be the consequence of earth movement, whether the earth movement is combined with any other cause. Earth movement includes, but is not limited to earthquake, landslide, subsidence, mudflow, sinkhole, erosion, or the sinking, rising, shifting, expanding or contracting of earth or soil.

This exclusion applies regardless of the cause or causes of the earth movement and includes defects or negligence in design, construction or materials, or any other event, conduct or misconduct which may have or is claimed to have precipitated, caused or acted jointly, concurrently, or in sequence with earth movement in causing the **bodily injury** or **property damage**.

Notwithstanding any provision of this policy to the contrary, where any claim or **suit** is based in whole or in part upon earth movement, as set forth above, the Company shall have the right, but not the obligation, to defend such lawsuit. The Company shall reimburse the **insured** upon the conclusion or resolution of the claim or **suit**, based upon the proportion of damages covered by the policy to damages excluded herein.

This exclusion only applies to **bodily injury** and **property damage** that is included in the **Products-Completed Operation Hazard**."[37]

---

[35]Fact Stip., ¶ 7(A); see Defs.' Facts, ¶ 6(A); Pl.'s Genuine Issues, ¶ 6(A).

[36]Fact Stip., ¶ 7(B); see Defs.' Facts, ¶ 6(B); Pl.'s Genuine Issues, ¶ 6(B).

[37]Fact Stip., ¶ 9; see Defs.' Facts, ¶ 8; Pl.'s Genuine Issues, ¶ 8; Pl.'s Facts, ¶ 11.3; Defs.' Genuine Issues, ¶ 11.3.

**D.    USF's Claims**

USF does not dispute that its Policy and Golden Bear's Policy covered the claims asserted against Hondo.[38] It contends, however, that Clarendon National and Clarendon America also had a duty to defend Hondo in the Underlying Action, and that they should have participated in the defense on an "equal share" basis.[39] USF requests that the court order each defendant to reimburse USF a third of the total defense fees and costs it paid, or $39,143.27 each.[40]

USF also contends that defendants should be ordered to contribute a share of the settlement paid on Hondo's behalf. USF asserts that Clarendon National and Clarendon America should have indemnified Hondo on a "time-on-risk" basis, as measured by the dates of the Notices of Completion for the allegedly defective homes.[41] USF contends that Clarendon National should be ordered to pay $14,587.50 as its share of the indemnification obligation, while Clarendon America should be ordered to pay $58,250.00.[42]

## II. DISCUSSION

**A.    Legal Standard Governing Motions For Summary Judgment**

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of

---

[38]Defs.' Facts, ¶ 16; Pl.'s Genuine Issues, ¶ 16.

[39]Fact Stip., ¶¶ 16, 16(A); see Defs.' Facts, ¶ 16(A); Pl.'s Genuine Issues, ¶ 16(A).

[40]Fact Stip., ¶ 16(A); see Defs.' Facts, ¶ 16(A); Pl.'s Genuine Issues, ¶ 16(A).

[41]Id., ¶ 16(B); see Defs.' Facts, ¶ 16(B); Pl.'s Genuine Issues, ¶ 16(B).

[42]Fact Stip., ¶ 16(B); see Defs.' Facts, ¶ 16(B); Pl.'s Genuine Issues, ¶ 16(B).

1    material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party

2    will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that

3    no reasonable trier of fact could find other than for the moving party. On an issue as to which

4    the nonmoving party will have the burden of proof, however, the movant can prevail merely by

5    pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.*

6    If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or

7    as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."

8    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

9          In judging evidence at the summary judgment stage, the court does not make credibility

10   determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most

11   favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors*

12   *Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). The evidence presented by the parties must be

13   admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving

14   papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Nelson*

15   *v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and

16   speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub.*

17   *Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

18         In this case, the parties have filed cross-motions for summary judgment or partial summary

19   judgment "[T]he mere fact that the parties make cross-motions for summary judgment does not

20   necessarily mean that there are no disputed issues of material fact and does not necessarily permit

21   the judge to render judgment in favor of one side or the other." *Starsky v. Williams*, 512 F.2d

22   109, 112 (9th Cir. 1975) (citation omitted). Summary judgment in favor of one party may be

23   appropriate, however, where, as here, "the parties in fact agree[ ] that all of the underlying

24   material facts [are] those reflected by the written record before the court," and the only remaining

25   dispute is a legal one. *Id.*

26         In their motion, Clarendon National and Clarendon America assert that their Policies

27   (collectively, the "Clarendon Policies") did not cover the claims asserted against Hondo in the

28   Underlying Action because: "(1) The alleged 'property damage' [did] not arise from an

1   'occurrence' that took place during either of the Clarendon policy periods as required by the

2   Insuring Agreements. . . ; **AND** (2) The alleged 'property damage' did not 'first take place'

3   during either of the Clarendon policy periods as required by the Insuring Agreements. . ."[43]

4   Consequently, defendants contend, they had no duty to indemnify Hondo in the Underlying

5   Action, and have no obligation to reimburse USF for any part of the settlement payment it made

6   on Hondo's behalf.[44]   Defendants also contend that they had no duty to defend Hondo in the

7   Underlying Action because of two exclusionary provisions in their Policies, namely, the "absolute

8   earth movement exclusion" and the "excess defense" clause.[45]   Thus, they assert they are entitled

9   to summary judgment or partial summary judgment on USF's first and third causes of action.

10          USF counters that summary judgment or partial summary judgment should be entered in

11   its favor because the undisputed facts show that both the "occurrence" and "property damage"

12   took place during the Clarendon policy periods.[46]   USF contends that defendants' reliance on the

13   "excess insurance" and "absolute earth movement exclusion" provisions is contrary to California

14   law, and asserts that nothing in the Policies absolved defendants of their clear duty to defend

15   Hondo in the Underlying Action.[47]   It requests that the court order defendants to pay an equitable

16

--------

17          [43]Memorandum of Points and Authorities in Support of Defendants Clarendon America and
18   Clarendon National's Motion for Summary Judgment, or, in the Alternative, for Summary
     Adjudication of the Plaintiff's First and Third Causes of Action ("Defs.' Mot.") at 3; see *id.* at
19   10-20.  Defendants oppose plaintiff's motion on the same grounds. (See Memorandum of Points
20   and Authorities in Opposition to USF's Motion for Summary Judgment, or in the Alternative
     Summary Adjudication ("Defs.' Opp.") at 3.)

21          [44]Defs.' Mot. at 20; Defs.' Opp. at 10-12.
22
23          [45]Defs.' Mot. at 20-28; Defs.' Opp. at 12.

24          [46]Memorandum of Points and Authorities in Support of USF Insurance Company's Motion
     for Summary Judgment, or in the Alternative Summary Adjudication ("Pl.'s Mot.") at 12-14.
25   Plaintiff opposes defendants' motion on the same grounds.  (See Memorandum of Points and
     Authorities in Support of USF Insurance Company's Opposition to Clarendon's Motion for
26   Summary Judgment, or in the Alternative Summary Adjudication to Plaintiff's First and Third
27   Causes of Action ("Pl.'s Opp.") at 1-13.)

28          [47]Pl.'s Mot. at 15-21.

1  share of the defense fees and settlement payment.

2  **B.     Whether Defendants Had A Duty To Indemnify Hondo In The Underlying**

3  **Action And Whether Plaintiff Is Entitled To Equitable Contribution**

4  To decide whether defendants had a duty to indemnify Hondo, the court must first interpret

5  the coverage provisions and exclusions in the Clarendon Policies.  See *Modern Dev. Co. v.*

6  *Navigators Ins. Co.*, 111 Cal.App.4th 932, 939 (2003) (". . . [I]n determining whether allegations

7  in a particular complaint give rise to coverage under a comprehensive general liability policy,

8  courts must consider both the occurrence language in the policy, and the endorsements or

9  exclusions affecting coverage, if any, included in the policy terms," citing *Collins v. Am. Empire*

10 *Ins. Co.*, 21 Cal.App.4th 787, 803 (1994)).

11 **1.     Standard Governing Interpretation Of An Insurance Policy**

12 Under California law,[48] interpretation of an insurance policy is a legal matter for the court.

13 See *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1, 18 (1995); see also *Armstrong World*

14 *Industries, Inc. v. Aetna Casualty & Surety Co.*, 45 Cal.App.4th 1, 10-11 (1996) ("Interpretation

15 of an insurance policy is primarily a judicial function").   The principles governing the

16 interpretation of insurance policies are well-settled.  Because insurance policies are contracts,

17 ordinary rules of contractual interpretation apply.  See *La Jolla Beach & Tennis Club, Inc. v.*

18 *Industrial Indemnity Co.*, 9 Cal.4th 27, 37 (1994); *Bank of the West v. Superior Court*, 2 Cal.4th

19 1254, 1264 (1992).

20 "The fundamental goal of contractual interpretation is to give effect to the mutual intention

21 of the parties." *Bank of the West*, 2 Cal.4th at 1264 (citing CAL. CIVIL CODE § 1636); see also

22 *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37.  To ascertain the parties' intent, the court must

23 look first to the language of the policy itself.  See *A.B.S. Clothing Collection, Inc. v. Home Ins.*

24 _____

25 [48]USF argues that California law governs this case.  (Pl.'s Mot. at 11.)  Clarendon
National and Clarendon America do not challenge this assertion, and, like USF, cite California
26 law in support of their motion.  Because the parties are in agreement, and because the subject
matter of the insurance contract was located in California, the court will apply California law.
27 See *Stonewall Surplus Lines Ins. Co. v. Johnson Controls, Inc.*, 14 Cal.App.4th 637, 646 (1993)
28 (California choice of law rules place particular importance on the location of the insured risk).

1  *Co.*, 34 Cal.App.4th 1470, 1478 (1995); *La Jolla Beach & Tennis Club*, 9 Cal.4th at 37. If,

2  given their "common and popular meaning," the contract terms are clear and explicit, they

3  control.  See *Bank of the West*, 2 Cal.4th at 1264 (citing Cal. Civil Code § 1638); *A.B.S.*, 34

4  Cal.App.4th at 1478; see also *Republic Indemnity Co. of America v. Schofield*, 47 Cal.App.4th

5  200, 225 (1996) (provisions are to be "interpreted in their 'ordinary and popular sense'").

6      A policy provision is "ambiguous when it is capable of two or more constructions, both

7  of which are reasonable." *La Jolla Beach & Tennis Club*, 9 Cal. 4th at 37 (quotations omitted).

8  "'Courts will not adopt a strained or absurd interpretation [of policy language, however,] in order

9  to create an ambiguity where none exists.'" *Id.* (quoting *Reserve Ins. Co. v. Pisciotta*, 30 Cal.3d

10  800, 807 (1982)).  Where ambiguity is found, policy terms must be construed to give effect to the

11  objectively reasonable expectations of the insured.  *Bay Cities Paving & Grading, Inc. v.*

12  *Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 867 (1993); *A.B.S.*, 34 Cal.App.4th at 1478.  If

13  application of these rules does not eliminate or resolve an ambiguity in the policy, it is resolved

14  against the insurer and in favor of liability under the policy. *La Jolla Beach & Tennis Club*, 9

15  Cal.4th at 37; *Bank of the West*, 2 Cal.4th at 1265.

16      **2.    Coverage Terms In The Clarendon Policies**

17      The Clarendon Policies require that the insurer "pay those sums that an insured becomes

18  legally obligated to pay as damages for bodily injury or property damage to which this insurance

19  applies."[49]  The Policies condition coverage on two key requirements: (1) "The bodily injury or

20  property damage [must be] caused by an occurrence which takes place during the policy period

21  whether such occurrence is known to the Insured"; and (2) "The bodily injury or property damage

22  resulting from such occurrence [must] first take[ ] place during the policy period."[50]  The Policies

23  also contain a "deemer clause," which provides: "All property damage or bodily injury arising

24                    ————————————

25      [49]Fact Stip., ¶ 6.

26      [50]*Id.*  The third requirement for coverage is that "The bodily injury or property damage

27  is caused by an occurrence which takes place in the coverage territory." *Id.*  Because the parties
do not dispute that the property damage took place within the coverage territory, the court does

28  not analyze this issue.

1    from, caused by or contributed to by, or in consequence of an occurrence shall be deemed to take

2    place at the time of the first such damage, even though the nature and extent of such damage or

3    injury may change and even though the damage may be continuous, progressive, cumulative,

4    changing or evolving, and even though the occurrence causing such bodily injury or property

5    damage may be continuous or repeated exposure to substantially the same general harm."[51]

6         The Policies provide a standard definition of "property damage," i.e., "[p]hysical injury

7    to tangible property including all resulting loss of use of that property."[52]  "Occurrence" is

8    defined as "[a]n accident, including continuous or repeated exposure to substantially the same

9    general harm."[53]

10        Defendants argue it is clear under these coverage provisions that "occurrence" is not

11   synonymous with "property damage," and that it refers to the *cause* of the property damage.[54]

12   They assert that the operative "occurrence" in this case was either Hondo's purportedly negligent

13   work on 90 of the 127 homes at issue in the Underlying Action, or the exposure of its work to

14   the elements.[55]  Defendants contend that because Hondo completed its framing work in or before

15   July 1997, and because more than twelve inches of rain fell in Rancho Santa Margarita between

16   June 1997 and March 1999,[56] the "occurrence" could not have transpired during their policy

17   periods.[57]  They also assert that the property damage caused by Hondo's defective work first

18   occurred before the inception of the Policies.  In support, they cite the report of their agent,

19   Dynamic Claims Services, Inc., which contains a summary of homeowner complaints between

20   _____

21        [51]*Id.*

22        [52]*Id.*, ¶ 7(A).

23        [53]*Id.*, ¶ 7(B).

24        [54]Defs.' Mot. at 10-11.

25        [55]*Id.* at 13-14.

26        [56]Fact Stip., ¶ 18.  See Defs.' Facts, ¶ 18; Pl.'s Genuine Issues, ¶ 18.

27        [57]See Defs.' Mot. at 20.

28

1   1994 and 1998, regarding cracks and splits in the walls and stucco, water leakage, and other

2   damages that appear to have resulted from defects in the framing and rough carpentry of the

3   houses.[58] Because they assert that neither the accident constituting the "occurrence" nor the first

4   instance of "property damage" caused by the occurrence took place within their policy periods,

5   defendants contend the Policies did not provide coverage to Hondo for the Underlying Action.[59]

6          USF counters that because the homeowners filed their action on June 20, 2003 and alleged

7   that they had only discovered the defects within the prior three years, "all of the damages

8   plaintiffs were seeking became manifest at the earliest during the Clarendon policies."[60] While

9   acknowledging that the "manifestation" of property damage is not synonymous with an

10  "occurrence," USF asserts that "in the absence of other evidence [manifestation] is the only

11  evidence of the 'occurrence of damage.'"[61]   USF also contends that the "continuous injury

12  trigger" rule, adopted by the California Supreme Court in *Montrose Chemical Corp. v. Admiral

13  Ins. Co.*, 10 Cal.4th 645 (1995) ("*Montrose II*"), controls here. Under that rule, USF argues, the

14  Clarendon Policies afforded coverage to Hondo because the homeowners continued to experience

15  property damage between April 2000 and July 2001.[62]

16         In *Montrose II*, a chemical company that had produced the pesticide dichloro-diphenyl-

17  _____

18  [58]See Declaration of James F. Berry in Support of Defendants' Motion for Summary
    Judgment or, in the Alternative, for Summary Adjudication ("Berry Decl."), Exh. 1. Plaintiff
19  objects to the Dynamic Claims Services report on multiple grounds: (1) that it is inadmissible
    hearsay under Rules 801(c) and 802 of the Federal Rule of Evidence; (2) that it is irrelevant under
20  Rules 401 and 402; (3) that it is unfairly prejudicial and will confuse the issues under Rule 403;
21  (4) that the author of the report lacks personal knowledge of the facts recited therein, making it
    inadmissible under Rule 602; (5) that the report has not been authenticated as required by Rule
22  901; and (6) that it is improper opinion testimony under Rule 701.  (Pl.'s Genuine Issues, ¶ 19.)
23  Because the court finds it unnecessary to refer to the report in deciding the coverage issue, it
    declines to rule on USF's objections at this time.
24
25  [59]Defs.' Mot. at 11-20.

26  [60]*Id.* at 12.

27  [61]*Id.*

28  [62]Pl.'s Mot. at 1.

18

1    trichlorethane (DDT) from 1947 to 1982 was sued in five separate actions alleging improper

2    disposal of hazardous wastes.  *Id.* at 656.  From January 1960 to March 1986, the chemical

3    company was insured by seven different carriers; each policy covered a distinct time period within

4    the twenty-six year span.  *Id.*  Admiral Insurance Company had issued four CGL policies with

5    effective dates from October 1982 to March 1986.  *Id.*  The question on appeal was whether

6    Admiral had a duty to defend the chemical company in the third-party suits – that is, whether

7    there was a possibility that events took place during Admiral's policy periods that triggered

8    coverage under its policies.  *Id.*; see also *id.* at 655 n. 2 (". . . '[T]rigger of coverage' is a term

9    of convenience used to describe that which, under the specific terms of an insurance policy, must

10   happen in the policy period in order for the *potential* for coverage to arise.  The issue is largely

11   one of timing – what must take place *within the policy's effective dates* for the potential of

12   coverage to be 'triggered'?" (emphasis original)).

13          To answer this question, the California Supreme Court carefully examined the coverage

14   provisions of Admiral's policies, which used the standard language of CGL policies at the time.

15   *Id.* at 656.  Admiral's policies provided that the insurer would "pay on behalf of the insured all

16   sums which the insured shall become legally obligated to pay as damages because of . . . bodily

17   injury, or . . . property damage to which this insurance applies, caused by an occurrence."  *Id.*

18   The policies defined "property damage" as "(1) physical injury to or destruction of tangible

19   property *which occurs during the policy period*, including the loss of use thereof at any time

20   resulting therefrom. . . ."  *Id.* at 668 (emphasis original).  They defined "occurrence" as "an

21   accident, including continuous or repeated exposure to conditions, which results in bodily injury

22   or property damage neither expected nor intended from the standpoint of the insured."  *Id.* at 656.

23          The Court concluded that these provisions were plain and unambiguous.  It observed first

24   that "property damage" definition "clearly and explicitly provide[d] that the occurrence of bodily

25   injury or property damage during the policy period [was] the operative event that trigger[ed]

26   coverage."  *Id.* at 669.  Reading all of the clauses together, the Court determined that the policies

27   distinguished between the causative "occurrence" and the resulting "property damage," and

28   unambiguously provided that it was the "the latter injury or damage that must 'occur' during the

1   policy period" before coverage would be triggered. *Id.* Because plaintiffs in the pending actions

2   had alleged that their bodily injury and property damage "continuously or progressively

3   deteriorat[ed] throughout Admiral's policy periods," the Court held that there was a potential for

4   coverage under Admiral's policies. *Id.*; see also *id.* at 673 ("[T]he weight of authority, consistent

5   with our own interpretation of Admiral's express policy language, is that bodily injury and

6   property damage that is continuous or progressively deteriorating throughout successive CGL

7   policy periods, is potentially covered by all policies in effect during those periods").

8          The Clarendon Policies contain contractual language that is different than that of the

9   policies at issue in *Montrose II*. In fact, as USF concedes, the coverage terms of defendants'

10  Policies were revised in 1996 to "circumvent the continuous injury trigger of the coverage rule

11  laid down" in *Montrose II*.[63] Insurance companies are not required to use the standard policy

12  form; they are free to modify the standard language or adopt their own non-standard policy. See

13  *Dart Indus., Inc. v. Commercial Union Ins. Co.*, 28 Cal.4th 1059, 1074 & n. 5 (2002); cf. *La*

14  *Jolla Beach & Tennis Club*, 9 Cal.4th at 37 ("While insurance contracts have special features,

15  they are still contracts to which the ordinary rules of contractual interpretation apply" (citations

16  omitted)). Thus, to determine whether Clarendon National and Clarendon America had a duty

17  to defend Hondo in the Underlying Action, the court must look to the particular language of their

18  Policies. *Garriott Crop Dusting Co. v. Superior Court*, 221 Cal.App.3d 783, 790 (1990) ("The

19  proper initial focus for a court in resolving a question of insurance coverage is on the language

20  of the insurance policy itself, rather than on judicially created 'general' rules that are not

21  necessarily responsive to the policy language or facts of the dispute," citing *Harbor Ins. Co. v.*

22  *Central National Ins. Co.*, 165 Cal.App.3d 1029, 1034-35 (1985)).

23         Like the policies at issue in *Montrose II*, the Clarendon Policies make a clear distinction

24  between the "occurrence," which is the accident or exposure that *causes* damage to the claimant,

25  and the resulting "physical damage." See *Montrose II*, 10 Cal.4th at 669. Where the Clarendon

26  Policies depart from the *Montrose II* policies is in the requirements for coverage. The standard

27

28         [63]Pl.'s Opp. at 10.

1   policy language in 1995 provided coverage so long as *some* bodily injury or property damage took

2   place within the policy period, regardless of when the injury or damage began.  See *id.* at 676

3   ("The timing of the accident, event, or conditions *causing* the bodily injury or property damage,

4   e.g., an insured's negligent act, is largely immaterial to establishing coverage; it can occur before

5   or during the policy period.   Neither is the date of discovery of the damage or injury

6   controlling. . . .  It is only the *effect* – the occurrence of bodily injury or property damage during

7   the policy period, resulting from a sudden accidental event or the 'continuous or repeated

8   exposure to conditions' – that triggers potential liability coverage").  The Clarendon Policies, by

9   contrast, require that both the *occurrence* and the *first* instance of property damage take place

10  during the policy period.[64]   Additionally, they explicitly deem that all property damage caused

11  contributed to by an occurrence takes place "at the time of the first such damage."  This is so

12  "even though the nature and extent of such damage or injury may change and even though the

13  damage may be continuous, progressive, cumulative, changing or evolving, and even though the

14  occurrence causing such bodily injury or property damage may be continuous or repeated

15  exposure to substantially the same general harm."[65]  These provisions make clear that progressive

16  property damage that starts before the insurers' policy period, but continues into the period, does

17  not trigger coverage.   Rather, the Policies explicitly place property damage of this type outside

18  the scope of the insuring agreement.   As a result, the unequivocal language of the Clarendon

19  Policies is not susceptible of the interpretation given the older policy language in *Montrose II.*

20  See David L. Leitner, Reagan W. Simpson, and John M. Bjorkman, 4 LAW AND PRAC. OF INS.

21  COVERAGE LITIG., § 46:21 (2005) ("In response to *Montrose* and those courts that have adopted

22  it, the ISO recently revised the standard CGL policy to exclude from coverage injury or damage

23  that occurs 'in part' before the policy begins.  This change will obviously reduce the number of

24  insurers deemed responsible to defend and indemnify an insured under the continuous trigger

25  theory," citing Insurance Risk Management Institute, EXECUTIVE BRIEFING IN COMMERCIAL

26  _____

27     [64]See Fact Stip., ¶ 6.

28     [65]*Id.*

21

1   LIABILITY INSURANCE, Vol I (July 1999)); see also *La Jolla Beach & Tennis Club*, 9 Cal.4th at

2   37 ("If contractual language is clear and explicit, it governs" (citations omitted)); *St. Paul Fire*

3   *& Marine Ins. Co. v. Coss*, 80 Cal.App.3d 888, 896 (1978) ("An insurance policy is a contract,

4   and when the terms are plain and unambiguous, it is the duty of the court to hold the parties to

5   such contract. The courts will not indulge in a forced construction of an insurance policy so as

6   to fasten a liability on the insurance company which it has not assumed" (citation omitted)).

7        USF concedes that there is coverage under its Policy, which contains the same insuring

8   language as the Clarendon Policies.[66]  It is therefore undisputed that at least some "property

9   damage" to the Rancho Santa Margarita homes took place during USF's policy period, i.e.,

10  between July 15, 1988 and July 15, 1999.[67]  Consequently, the *first* instance of "property

11  damage" could not have taken place during subsequent policy periods when defendants were on

12  the risk. Having admitted coverage under its own Policy, USF's contention that coverage under

13  defendants' Policies was also triggered essentially asks the court to ignore or rewrite Section

14  I.A.b(3), which plainly requires that "[t]he bodily injury or property damage resulting from such

15  occurrence first take[ ] place during the policy period."[68]  This the court declines to do.  See

16  _____

17        [66]Defs.' Facts, ¶ 16; Pl.'s Genuine Issues, ¶ 16.

18        [67]Fact Stip., ¶ 3(A), ¶ 5, Exh. 4 (USF Policy).

19        [68]To prevail on summary judgment, defendants need only point to an absence of evidence

20  to support USF's cause of action.  The only evidence in the record concerning the cause of the
    property damage suffered by the Rancho Santa Margarita homeowners is the parties' factual

21  stipulations regarding Hondo's negligent framing work, which was completed in or before July

22  1997, and the amount of rainfall that feel in Rancho Santa Margarita between June 1997 and
    March 1999.  USF has adduced no evidence tending to show that the occurrence that caused

23  property damage during defendants' policy periods was different than that which caused property
    damage during its own policy period.  As a result, under the deemer clause, all property damage

24  that took place during defendants' policy periods must be treated as having first taken place during

25  plaintiff's policy period or earlier.  When the damage or defects first "manifested" is irrelevant.
    See *Montrose II*, 10 Cal.4th at 676 (in determining whether property damage took place within

26  the policy period, "the date of discovery of the damage or injury [is not] controlling"); *Pepperell*,

27  62 Cal.App.4th at 1055 (holding, in a case where the third-party claimant "alleged defective
    design and construction involving virtually every part of the home" and latent defects "were not

28  discovered until [several years after the completion of the construction]. . ., when [they] began

1   *Safeco Ins. Co. v. Gilstrap*, 14 Cal.App.3d 524, 532-33 (1983) ("Although we construe all

2   provisions, conditions, or exceptions that tend to limit liability strictly against the insurer, strict

3   construction does not mean strained construction.   We may not, under the guise of strict

4   construction, rewrite a policy to bind the insurer to a risk that it did not contemplate and for which

5   it has not been paid" (citations omitted)).

6         Because the homeowners' property damage did not first take place during the Clarendon

7   policy periods, the court concludes that defendants had no duty to indemnify Hondo in the

8   Underlying Action.   USF, moreover, has identified no compelling equitable reason to impose

9   liability on defendants where none exists under their Policies.   See *Truck Ins. Exchange v.*

10  *Unigard Ins. Co.*, 79 Cal.App.4th 966, 974 (2000) ("In the insurance context, the right to

11  contribution arises when several insurers are *obligated to indemnify or defend the same loss or*

12  *claim*, and one insurer has paid more than its share of the loss or defended the action without any

13  participation by the others. . . . Equitable contribution permits reimbursement to the insurer that

14  paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory

15  that the debt it paid was equally and concurrently owed by the other insurers . . . . *[A]bsent*

16  *compelling equitable reasons*, courts should not impose an obligation on an insurer that

17  contravenes a provision in its insurance policy" (citations omitted and emphasis added)); see also

18  *Signal Companies, Inc. v. Harbor Ins. Co.*, 27 Cal.2d 359, 369 (1980) ("To impose an obligation

19  on Harbor to reimburse Pacific in contravention of the provisions of its policy could only be

20  justified, however, by some compelling equitable consideration.   We find no such consideration

21  here.   Before seeking Harbor's contribution to the settlement, Pacific acted in all respects for its

22  own benefit.   The defense costs at issue were incurred by Pacific in the performance of its

23  contractual obligation to its insured to afford a defense").   The court therefore concludes that

24  Clarendon National and Clarendon America have neither a legal duty nor an equitable obligation

25  to contribute to the settlement amount.   Accordingly, the court grants defendants' motion for

26  ———————————

27  to manifest themselves to varying degrees," that the injury was potentially a "continuing and
    progressively deteriorating process which *began with defective design and construction* admittedly
28  *within* the pertinent policy period" (emphasis added)).

1   summary judgment on plaintiffs' second and fourth causes of action, and denies USF's cross-

2   motion as to these claims.

3       **C.**    **Whether Defendants Had A Duty To Defend Hondo In The Underlying Action**

4           **1.**    **Legal Standard Governing An Insurer's Duty To Defend**

5           Under California law, an insurer has a broad duty to defend its insured, which "may apply

6   even in an action where no damages are ultimately awarded." *Scottsdale Ins. Co. v. MV Transp.*,

7   36 Cal.4th 643, 654 (2005) (citing *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081

8   (1993)). In *Montrose Chemical Corp. v. Superior Court*, 6 Cal.4th 287 (1993) ("*Montrose I*"),

9   and again in *Montrose II*, 10 Cal.4th 645, the California Supreme Court held that when a suit

10   against an insured alleges a claim that "potentially" or even "possibly" may subject the insured

11   to liability for covered damages, an insurer must defend unless and until it can demonstrate, by

12   reference to "undisputed facts," that the claim is not covered. *Montrose I*, 6 Cal.4th at 299-300;

13   see also *Montrose II*, 10 Cal.4th at 661-62 n. 10; *Pardee Construction Co. v. Insurance Co. of*

14   *the West*, 77 Cal.App.4th 1340, 1351 (2000).

15           California courts consider all facts available to the insurer at the time the insured tenders

16   a claim in determining the scope of the insurer's defense obligation. *Montrose I*, 6 Cal.4th at 287

17   (stating that the court must examine "the policy, the complaint, and all facts known to the insurer

18   from any source"); *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal.App.4th 500, 508-09 (2001)

19   ("The existence of the duty to defend turns on all facts known by the insurer at the inception of

20   the third party lawsuit"); *CNA Casualty of Cal. v. Seaboard Surety Co.*, 176 Cal.App.3d 598, 605

21   (1986) ("An insurer's duty to defend must be analyzed and determined on the basis of any

22   potential liability arising from facts available to the insurer from the complaint or other sources

23   available to it at the time of the tender of defense"); see also *Systems XIX, Inc. v. United Capitol*

24   *Ins. Co.*, No. C 98-0481 MJJ, 1999 WL 447599, * 5 (N.D. Cal. June 23, 1999) (Unpub. Disp.)

25   (the duty-to-defend inquiry "focuses on what the insurer knew or should have known at the time

26   of declining coverage").

27           To determine whether an insurer has a duty to defend, the court first compares the

28   allegations of the complaint with the terms of the policy, and ascertains whether the facts alleged,

1  together with facts not alleged but known to the insurer at the inception of the lawsuit or tender

2  of defense, reveal a possibility that the claim is covered. *Montrose I*, 6 Cal.4th at 295; see also

3  *State Farm Fire & Casualty Co. v. Century Indemnity Co.*, 59 Cal.App.4th 648, 657 (1997).

4  Facts outside the allegations of the complaint are considered because of the possibility that the

5  ·pleadings could be amended to state a covered claim. See *Scottsdale Ins. Co. v. MV Transp.*, 36

6  Cal.4th 643, 654 (2005) ("But the duty also exists where extrinsic facts known to the insurer

7  suggest that the claim may be covered"); *Montrose I*, 6 Cal.4th at 296 ("[F]acts known to the

8  insurer and extrinsic to the third party complaint can generate a duty to defend, even though the

9  face of the complaint does not reflect a potential for liability under the policy. This is so because

10  current pleading rules liberally allow amendment; the third party plaintiff cannot be the arbiter

11  of coverage" (citations omitted)); *State Farm Fire & Casualty Co.*, 59 Cal.App.4th at 657 ("In

12  determining whether an insurer has a duty to defend, a court first compares the allegations in the

13  complaint with terms of the policy. Next, it looks to facts that may not have been alleged but

14  were known to the insurer when the action was filed").

15      "[T]he insured is entitled to a defense if the underlying complaint alleges the insured's

16  liability for damages potentially covered under the policy, or if the complaint might be amended

17  to give rise to a liability that would be covered under the policy." *Montrose I*, 6 Cal.4th at 299

18  (citing *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 275-76 (1966)); see also *Pepperell v. Scottsdale*

19  *Ins. Co.*, 62 Cal.App.4th 1045 (1998). "Any doubt as to whether the facts give rise to a duty to

20  defend is resolved in the insured's favor." *Horace Mann Ins. Co.*, 4 Cal.4th at 1081; see also

21  *Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal.App.4th 932, 942 (2003).

22      The duty to defend is not without limits, however. "'[T]he insurer need not defend if the

23  third party complaint can by no conceivable theory raise a single issue which could bring it within

24  the policy coverage.'" *La Jolla Beach & Tennis Club*, 9 Cal.4th at 39 (quoting *Gray*, 65 Cal.2d

25  at 276 n. 15); see also *Uhrich v. State Farm Fire & Cas. Co.*, 109 Cal.App.4th 598, (2003)

26  (". . . [T]he obligation to defend is not without limits. . . . [T]he duty to defend derives from the

27  insurer's coverage obligations assumed under the insurance contract. Thus, where there is no

28  potential for coverage, there is no duty to defend," quoting *Quan v. Truck Ins. Exchange*, 67

1   Cal.App.4th 583, 591-92 (1998) (internal quotations and citations omitted)).  Stated differently,

2   "[w]here there is no potential for the third party to recover on a covered claim, there is no duty

3   to defend."  *Devin v. United Services Auto. Assn.*, 6 Cal.App.4th 1149, 1157 (1992) (citations

4   omitted).   The insured "'may not speculate about unpled third party claims to manufacture

5   coverage.'"  *Michaelian v. State Comp. Ins. Fund*, 50 Cal.App.4th 1093, 1106 (1996) (quoting

6   *Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal.App.4th 1595, 1605 (1993)).  Moreover,

7   the insurer has no duty to defend where the potential for liability is "'tenuous and farfetched.'"

8   *Id.* (quoting *American Guar. & Liability v. Vista Medical Supply*, 699 F.Supp. 787, 794 (N.D.

9   Cal. 1988)).  The ultimate question is whether the facts alleged "fairly apprise" the insurer that

10  suit is being brought on a covered claim.  *Id.* (quoting *Gray,* 65 Cal.2d at 275 n. 15).

11          An insurer has a duty to defend where there is a *factual* possibility of coverage.  The mere

12  fact that the courts have not previously construed the policy provision on which the insurer relies

13  to deny a defense does not give rise to a duty on its part.  *Waller,* 11 Cal.4th at 25 ("Plaintiffs'

14  related claim, that the lack of authority on the duty to defend issue required a defense by T.I.E.

15  of the Amey lawsuit because 'uncertainty of policy interpretation compels a duty to defend in this

16  case,' is equally unmeritorious.  *CNA Casualty* does not hold, as plaintiffs suggest, that the

17  insurer must always defend a third party lawsuit absent a published judicial opinion definitively

18  construing the specific policy provision on which the insurer relies, or, as plaintiffs assert, 'until

19  the extent of "the policy coverage" is legally certain,' to deny the defense.  This has never been

20  the law," citing *McLaughlin v. Nat'l Union Fire Ins. Co.*, 23 Cal.App.4th 1132, 1151 (1994)).

21  "[T]he law governing the insurer's duty to defend need not be settled at the time the insurer makes

22  its decision.  As several courts have explained, subsequent case law can establish, in hindsight,

23  that no duty to defend ever existed."  *Scottsdale Ins. Co.*, 36 Cal.4th at 657 (citations omitted);

24  see *Waller,* 11 Cal.4th at 26 ("If the terms of the policy provide no potential for coverage, . . .

25  the insurer acts properly in denying a defense even if that duty is later evaluated under case law

26  that did not exist at the time of the defense tender" (citations omitted)).

27          Clarendon National and Clarendon America "do not dispute that at the time of tender, . . .

28  the Underlying Action did, in fact, present the possibility of damage within the coverage grant."

1    They concede that they "*would* have had an obligation to defend Hondo, or more accurately to

2    participate in the defense along with Golden Bear and USF," but for the "absolute earth

3    movement exclusion" and "excess defense" provisions in the Policies.[69] The court must therefore

4    interpret these provisions and determine whether they absolved defendants of the duty to defend

5    

---

6    [69]Defs.' Opp. at 11-12.  In other parts of their opposition to plaintiff's motion, defendants

7    argue that "if there is no coverage then there is no defense or indemnity obligation," i.e., that a

     finding that there was no coverage under the Clarendon Policies automatically absolves them of

8    any duty to defend Hondo in the Underlying Action. (Defs.' Opp. at 3.) *Montrose I* makès clear

9    that a duty to defend arises if there is any *potential* for coverage, measured at the time the third-

     party suit is commenced or the defense tender is made.  See *Montrose I*, 6 Cal.4th at 295 (the

10   duty to defend "turns upon those facts known by the insurer at the inception of a third party

     lawsuit" (internal quotations omitted)); *CNA Casualty of Cal.*, 176 Cal.App.3d at 605 ("An

11   insurer's duty to defend must be analyzed and determined on the basis of any potential liability

12   arising from facts available to the insurer from the complaint or other sources available to it at

     the time of the tender of defense").  Therefore, an insurer can be held liable for breaching its duty

13   to defend the insured, even if it is later determined that the policy did not provide coverage for

     the claim.  See *Borg v. Transamerica Ins. Co.*, 47 Cal.App.4th 448, 454 (1996) ("An insurer may

14   have a duty to defend even when it ultimately has no obligation to indemnify, either because no

15   damages are awarded in the underlying action against the insured or because the actual judgment

     is for damages not covered under the policy"); see also *Wausau Underwriters Ins. Co. v. Unigard*

16   *Security Ins. Co.*, 68 Cal.App.4th 1030, 1033 (1988) ("Years after the defense tender, the action

17   was terminated by a stipulated judgment relating wholly to on-site contamination.  That fact does

     not retrospectively establish that the tenant-insureds had no exposure to a recovery for off-site

18   contamination at the earlier time of tender.  Whether there was, or was not, off-site contamination

19   was unknown at the time of tender.  The defense duty issue concerns whether the tenant-insureds

     faced potential liability covered by the policies, not whether that liability ever actually

20   materialized" (footnote omitted)); *Mullen v. Glen Falls Ins. Co.*, 73 Cal.App.3d 163, 173-74

21   (1977) (". . . [M]ay an insurance company, without making an investigation of any kind, deny

     an insured a defense àt a time when it has reason to believe that there is potential liability under

22   the insurance policy, and then rely upon the results of the personal injury lawsuit and subsequent

     factors to prove that there was in reality no potential liability in the first instance? . . . We believe

23   that public policy alone mandates a negative answer to the question; otherwise an insurance carrier

24   could refuse to defend its insured on the slightest provocation and then resort to hindsight for the

     justification.  Furthermore, a contrary holding would force the insured to finance his own

25   investigation and the defense of the lawsuit, and then to seek reimbursement in a second lawsuit

     against the insurance company.  This, in turn, could not only impose an undue financial burden

26   on persons who have purchased insurance protection, but it could deprive them of the expertise

27   and resources available to insurance carriers in making prompt and competent investigations as

     to the merits of lawsuits filed against their insureds").  Thus, this argument by defendants is

28   without merit.

27

1   Hondo in the Underlying Action.   See *Watts Industries, Inc. v. Zurich Am. Ins. Co.*, 121

2   Cal.App.4th 1029, 1046 (2004) ("Even if there is a possibility of covered damage to property

3   under the CGL coverage provisions, coverage may be defeated by policy exclusions").

4            **2.     Absolute Earth Movement Exclusion**

5            The "absolute earth movement exclusion" in the Clarendon Policies states, in part:

6            **"Bodily injury or property damage** claimed, in whole or in part, to arise from or

7            be aggravated by, or claimed to result from or be the consequence of earth

8            movement, whether the earth movement is combined with any other cause. . . .

9            This exclusion applies regardless of the cause or causes of the earth movement and

10           includes defects or negligence in design, construction or materials, or any other

11           event, conduct or misconduct which may have or is claimed to have precipitated,

12           caused or acted jointly, concurrently, or in sequence with earth movement in

13           causing the **bodily injury** or **property damage**. . . . Notwithstanding any provision

14           of this policy to the contrary, where any claim or **suit** is based in whole or in part

15           upon earth movement, as set forth above, the Company shall have the right, but not

16           the obligation, to defend such lawsuit.   The Company shall reimburse the **insured**

17           upon the conclusion or resolution of the claim or **suit**, based upon the proportion

18           of damages covered by the policy to damages excluded herein."[70]

19   Citing this exclusion, defendants contend they had no duty to defend Hondo because the

20   Underlying Action was based, at least in part, on claims of earth movement.   They point to the

21   allegation in the complaint that "[t]he defects include, without limitation and to various degrees

22   on the plaintiffs' respective residences, the following: . . . faulty soil compaction, faulty existing

23   underlying soils and expansive soils resulting in soil movement and damage to the

24

25   ────────────────

26           [70]Fact Stip., Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America
     Policy).   The absolute earth movement exclusion only applies to bodily injury or property damage
27   included in the "Products-Completed Operation Hazard."   Neither party disputes that the property
     damage claimed in the Underlying Action falls within the "Products-Completed Operation
28   Hazard" provision of defendants' Policies.

1    structures. . . ."[71]

2        USF does not dispute that the Underlying Action included "claims based in whole or in

3    part upon earth movement."[72]  It argues, however, that the absolute earth movement exclusion

4    did not eliminate defendants' duty to defend because expert reports revealed that only eight of the

5    127 homes at issue in the Underlying Action had damage caused by earth movement.[73]  USF also

6    notes that the complaint listed soil movement as a separate defect, and did not allege that earth

7    movement caused or contributed to other purported defects in the homes.[74]

8        Under California law, a defense duty is presumed unless it is "excluded by clear and

9    unambiguous language."  *Maryland Casualty Co. v. Nationwide Ins. Co.*, 65 Cal.App.4th 21, 30

10   (1998); see *id.* at 31 ("Under Civil Code section 2778, subdivision 4, a defense obligation is

11   implied in all indemnity agreements 'unless a contrary intention appears,' citing CAL. CIV. CODE

12   § 2778; *Save Mart Supermarkets v. Underwriters*, 843 F.Supp. 597, 602 (N.D. Cal. 1994);

13   DiMugno & Glad, CAL. INSURANCE LAW HANDBOOK (1997) §§ 46.01, 46.18(25), pp. 785, 860.)

14   To narrow its defense duty, an insurer must make the exclusion "conspicuous, plain and clear,"

15   so that the insured is put on reasonable notice of the limitation.  *Gray*, 65 Cal.2d at 273; see *Save*

16   *Mart Supermarkets*, 843 F.Supp. at 603 ("The duty to defend must be 'negated by language clear

17   enough to meet the requirement of *Gray v. Zurich* . . . that "any exception to the performance of

18   the underlying obligation must be so stated as clearly to apprise the insured of its effect,"'"

19   quoting *Mt. Hawley Ins. Co. v. F.D.I.C.*, 695 F.Supp. 469, 474 (C.D. Cal. 1987)).  As the

20   California Supreme Court confirmed in *MacKinnon v. Truck Ins. Exchange*, 31 Cal.4th 635

21   (2003):

------

23   [71]Behar Decl., Exh. O (Complaint for Damages, ¶ 15), Exh. P (First Amended Complaint
     for Damages, ¶ 15), Exh. Q (Second Amended Complaint for Damages, ¶ 15), Exh. R (Third
24   Amended Complaint for Damages, ¶ 15), Exh. S (Fourth Amended Complaint for Damages,
     ¶ 15), Exh. T (Fifth Amended Complaint for Damages, ¶ 15).
25

26   [72]Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

27   [73]Pl.'s Opp. at 18; see Defs.' Facts, ¶ 17; Pl.'s Genuine Issues, ¶ 17.

28   [74]*Id.*

1    " . . . [I]nsurance coverage is interpreted broadly so as to afford the greatest

2    possible protection to the insured, [whereas] . . . exclusionary clauses are

3    interpreted narrowly against the insurer.  [A]n insurer cannot escape its basic duty

4    to insure by means of an exclusionary clause that is unclear.  As we have declared

5    time and again any exception to the performance of the basic underlying obligation

6    must be so stated as clearly to apprise the insured of its effect.  Thus, the burden

7    rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable

8    language.  The exclusionary clause must be conspicuous, plain and clear.  This rule

9    applies with particular force when the coverage portion of the insurance policy

10   would lead an insured to reasonably expect coverage for the claim purportedly

11   excluded.  The burden is on the insured to establish that the claim is within the

12   basic scope of coverage and on the insurer to establish that the claim is specifically

13   excluded" (internal quotations and citations omitted).  *Id.* at 648.

14   Defendants' absolute earth movement exclusion falls short of this standard.  The exclusions

15   to coverage set forth in the Clarendon National and Clarendon America policies comprise slightly

16   more than six pages of text.  The absolute earth movement exclusion appears on the third of these

17   pages, four pages after the general insuring clauses.  It is the *only* exclusion in the Policies that

18   contains any language altering the defense obligation set forth in the insuring clauses, and there

19   is no heading or language in the Policies that puts the insured on notice of this fact.  The

20   relationship between the statement of the duty to defend found in the insuring clauses, and the

21   limitation on that duty inserted in the absolute earth movement exclusion, therefore, is not plain

22   and conspicuous.  See *Gray*, 65 Cal.2d at 272 ("This clause is not 'conspicuous' since it appears

23   only after a long and complicated page of fine print, and is itself in fine print; its relation to the

24   remaining clauses of the policy and its effect are surely not 'plain and clear'").[75]

25

26   [75]In their motion, defendants argue that the "excess defense" provision "is conspicuously

27   contained in the Insuring Agreement, on the first page of the policy, and not in a separate endorsement at the end of the policy."  (Defs.' Mot. at 23.)  They do not make a similar

28   argument respecting the absolute earth movement exclusion.

30

1    Additionally, the scope of the exclusion's limitation on the duty to defend is ambiguous.

2    The exclusion states that "where any claim or suit is based in whole or in part on earth

3    movement," the insurers will have the right, but not the obligation, to defend the "lawsuit."

4    "Claim" and "suit" are defined terms; "suit" means "a civil proceeding in which damage because

5    of bodily injury [or] property damage . . . to which this insurance applies are alleged." "Claim"

6    means "a request or demand received by any insured . . . for money . . . , including the service

7    of suit . . . against any insured."[76]  Clarendon National and Clarendon America contend that

8    under the absolute earth movement exclusion, they have no duty to defend if the underlying

9    complaint contains an allegation of earth movement, whether or not that allegation concerns the

10   insured or some other defendant.  The reference to "claim or suit" can be read more restrictively,

11   however, to mean that the insurers have no duty to defend a lawsuit if it includes an allegation that

12   property damage *caused by the insured* resulted, in whole or in part, from earth movement.

13       This narrower interpretation is consistent with the Policies' definition of "claim" as a

14   demand or suit "against [the] insured."  It is also consistent with the definition of "suit," which

15   incorporates the insuring clauses of the Policies.  As these clauses makes clear, the insurers

16   undertake to "pay [only] those sums that *an insured* becomes legally obligated to pay for damages

17   for bodily injury or property damage to which this insurance applies," and to "defend any suit"

18   seek seeking those damages.[77]  The mere fact that other defendants are joined with the insured in

19   a single lawsuit, and that they may have caused damage involving earth movement, cannot absolve

20   the insurers from providing the insured a defense so long as the insured's work did not result in

21   damage caused, in whole or in part, by earth movement.  Stated differently, where multiple

22   defendants are named in a single lawsuit, and multiple types of damage are alleged, an insurer can

23   invoke the absolute earth movement exclusion to deny a defense only if it is clear from the

24   allegations of the complaint and other information in its possession that the damage caused by the

[76]Fact Stip., Exh. 5 at 16, 18 (Clarendon National Policy), Exh. 6 at 18, 20 (Clarendon America Policy).

[77]Fact Stip., ¶ 6, Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America Policy) (emphasis added).

31

1  insured's work was also caused in whole or in part by earth movement.   See *Community*
2  *Redevelopment Agency of City of Los Angeles v. Aetna Casualty and Surety Co.*, 50 Cal.App.4th
3  329, 337 (1996) (Croskey, J.) ("United disputes that the subsidence exclusion [in Scottsdale's
4  policy] precludes a defense duty because there were other 'claims' of defective construction of
5  improvements asserted in the underlying damage actions.  Although ultimately found to be without
6  merit by the trial court (all of the damages suffered by homeowners were found to be due to
7  subsidence), the allegation of those claims was sufficient to raise a potential of coverage and
8  therefore a duty to defend.  Th[is] . . . argument[ ] may have some merit.   However, we do not
9  reach [it]. . .").

10        Such an interpretation is supported by the fact that the absolute earth movement exclusion
11  applies only to property damage that is included in the Products-Completed Operations Hazard.
12   The Products-Completed Operations Hazard includes all bodily injury and property damage
13  "arising out of your product or your work."[78]  "Your work" means, *inter alia*, "[w]ork or
14  operations performed by you or on your behalf."[79]  "You" refers to the named insured, i.e.,
15  Hondo.[80]  Because the exclusion is limited by its terms to work performed by the named insured,
16  the limitation on the insurers' defense obligations it includes must be read to extend only to
17  property damage caused by that work and also by earth movement.

18        Such an interpretation is consistent with the objectively reasonable expectations of the
19  insured.  See *Bay Cities Paving & Grading, Inc.*, 5 Cal.4th at 867; *A.B.S.*, 34 Cal.App.4th at
20  1478.  An insured might reasonably anticipate, based on the absolute earth movement exclusion,
21  that if *it* is sued for property damage caused in part by soil movement, the insurer will have no
22  duty to defend that suit.  ·An insured would *not* reasonably expect that its entitlement to a defense
23  would disappear any time it is joined in a multi-defendant suit where a third-party claimant asserts

24

---

25        [78]Fact Stip., Exh. 5 at 18 (Clarendon National Policy), Exh. 6 at 20 (Clarendon America
26  Policy).

27        [79]*Id.*, Exh. 5 at 19 (Clarendon National Policy), Exh. 6 at 21 (Clarendon America Policy).

28        [80]*Id.*, Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America Policy).

1   a claim involving earth movement against *some* defendants, but not specifically against it.

2   Compare *Garemendi v. Golden Eagle Ins. Corp.*, No. A099011, 2003 WL 21030255, *1-3

3   (Cal.App. May 8, 2003) (Unpub. Disp.) (finding that a similar earth movement exclusion

4   absolved an insurer of all defense and indemnity obligations because "[t]he collapse was attributed

5   to inadequate compaction of the underground utility trenches, including those constructed by" the

6   insured).

7        The homeowners in the Underlying Action did not allege that any damage caused by earth

8   movement was attributable to Hondo's work, nor did they allege that the property damage

9   resulting from Hondo's work had been caused or aggravated by earth movement.  Indeed, from

10  the face of the complaint, it is impossible to determine whether the "framing, siding and structural

11  defects" alleged have any relation to the "[f]aulty soil compaction, faulty existing underlying soils

12  and expansive soils resulting in soil movement and damage to the structures" about which the

13  homeowners complain.  Nothing in the summary judgment record suggests that Clarendon

14  National and Clarendon America had additional information linking the two types of damage at

15  the time they declined to defend the Underlying Action.  Therefore, the court concludes that the

16  absolute earth movement exclusion did not relieve defendants of their duty to defend Hondo in

17  the Underlying Action.

18              **3.    Excess Defense Provision**

19       The insuring clauses of the Clarendon Policies provide: "**Our** duty to defend is excess over

20  and shall not contribute where the **insured** has any other insurance under which, but for the

21  existence of this Policy, any other insurer is obligated to provide a defense."[81] USF contends that

22  this is essentially an "excess" or "other insurance" provision that cannot be given effect under

23  California law.[82]  It argues that *Century Surety Co. v. United Pacific Insurance Co.*, 109

24  Cal.App.4th 1246 (2003), and *Travelers Casualty Surety Co. v. Century Surety Co.*, 118

25

26       [81]Fact Stip., Exh. 5 at 3 (Clarendon National Policy), Exh. 6 at 3 (Clarendon America

27  Policy).

28       [82]Pl.'s Mot. at 15-16.

                                    33

1   Cal.App.4th 1156 (2004), clearly hold that where, as here, two or more primary CGL policies

2   contain identical "excess insurance" language, the provisions cancel one another out, and all

3   insurers are required to contribute to defense of the insured.[83]   Thus, USF asserts, to permit

4   defendants to use this "excess insurance" provision as a "escape clause" to avoid their defense

5   duty and contribution obligation would contravene California law.

6       Clarendon National and Clarendon America counter that the provision is not an "excess

7   insurance" clause, but an "excess defense" clause.[84]   They argue that *Century Surety Co.* and

8   *Travelers Casualty & Surety Co.* are inapplicable because, unlike the "excess insurance" provision

9   at issue in those cases, the provision in their Policies does not affect the scope of coverage or their

10  duty to indemnify the insured for covered losses.[85]

11      In *Century Surety Co.*, a group of homeowners sued the general contractor that had

12  constructed their houses.   *Century Surety Co.*, 109 Cal.App.4th at 1250-51.   The general

13  contractor filed a cross-complaint against several of the subcontractors involved in the

14  construction, including County Line Framing, Inc.   County Line tendered defense of the suit to

15  four commercial general liability insurers, which provided successive coverage over a five-year

16  period.   *Id.* at 1250.   Three of the insurers accepted the tender, defended County Line, and

17  eventually settled the matter.   *Id.*   The fourth insurer, Century Surety Company, rejected the

18  tender, asserting that it had no duty to defend because its coverage was "excess" to that provided

19  under the other policies.   *Id.*

20      The four policies contained nearly identical insuring language.   Each obligated the insurer

21  to "pay those sums the insured becomes legally obligated to pay as damages because of . . .

22  'property damage' to which this insurance applies," and to defend any "suit" seeking such

23  damages.   *Id.* at 1251.   The principal difference between Century's policy and the other insurers'

24  coverage was the "other insurance" provision.   The policies of the three defending companies

25

26      [83]*Id.* at 16.

27      [84]Defs.' Mot. at 21-26.

28      [85]*Id.*

34

1  contained a standard "other insurance" provision, which stated:

2       "4.    Other Insurance

3       If other valid and collectible insurance is available to the insured for a loss we

4       cover under Coverages A and B of this Coverage Part, our obligations are limited

5       as follows:

6            a.    Primary Insurance

7                This insurance is primary. . . .  If this insurance is primary, our

8                obligations are not affected unless any of the other insurance is

9                primary.   Then, we will share with that other insurance by the

10                method described in c. below. . . .

11            c.    Method of Sharing.  If all of the other insurance permits contribution

12                by equal shares, we will follow this method also.   Under this

13                approach, each insurer contributes equal amounts until it has paid its

14                applicable limit of insurance or none of the loss remains, whichever

15                comes first.   If any of the other insurance does not permit

16                contribution by equal shares, we will contribute by limits.  Under

17                this method, each insurer's share is based on the ratio of its

18                applicable limit of insurance to the total applicable limits of

19                insurance of all insurers."  *Id.* at 1251-52.

20  Century's policy, by contrast, included an endorsement that explicitly replaced the standard "other

21  insurance" language with the following provision:

22       "4.    Other Insurance·

23       If other valid and collectible insurance is available to any insured for a loss we

24       cover under the Coverage A or B of this Coverage Part, then this insurance is

25       excess of such insurance and we have no duty to defend any claim or 'suit' that any

26       other insurer has a duty to defend."  *Id.* at 1252.

27  Century argued that this provision clearly nullified any potential coverage under its policy and

28  absolved it of the duty to defend County Line in the underlying action.

1       Writing for the court, Justice Croskey concluded that Century's "excess insurance"

2   provision was contrary to public policy, since it permitted a *primary* insurer "to make a seemingly

3   ironclad guarantee of coverage, only to withdraw that coverage (and thus escape liability) in the

4   presence of other insurance." *Id.* at 1256 (quoting *Commerce & Industry Ins. Co. v. Chubb*

5   *Custom Ins. Co.*, 75 Cal.App.4th 739, 740 (1999)); see also *id.* ("Whatever may be said about

6   the merits of Century's attempt to limit its liability to 'excess' coverage, it is clear that it was not,

7   and it cannot claim to be, a true excess or secondary insurer as we have described that term").

8   The court also held that Century's "excess insurance" provision and the "other insurance"

9   provisions in the remaining policies were "mutually repugnant" such that it could not enforce

10   Century's policy without contravening the others. *Id.* at 1260.   For these reasons, the court

11   concluded that the appropriate course was "to ignore all of the clauses and require some equitable

12   pro rata apportionment" amongst all four insurers. *Id.*; see also *Signal Companies*, 27 Cal.3d at

13   369 ("The reciprocal rights and duties of several insurers who have covered the same event do

14   not arise out of contract, for their agreements are not with each other. . . .  Their respective

15   obligations flow from equitable principles designed to accomplish ultimate justice in the bearing

16   of a specific burden.  As these principles do not stem from agreement between the insurers their

17   application is not controlled by the language of their contracts with the respective policy

18   holders"); *Commerce & Industry Ins. Co.*, 75 Cal.App.4th at 749 ("[E]quity overrides the terms

19   of the insurance policies").

20       In *Travelers Casualty & Surety Co.*, a second California appellate court invalidated

21   Century's "excess insurance" provision as an "escape clause" and equitably apportioned a loss

22   between the successive insurers. *Travelers Casualty & Surety Co.*, 118 Cal.App.4th at 1159-64.

23   Citing language in *Dart Industries, Inc. v. Commercial Union Insurance Co.*, 28 Cal.4th 1059,

24   1079-80 (2002), the court predicted that, when presented with the issue, the California Supreme

25   Court would reach the same conclusion. See *id.* at 1162 (quoting *Dart Industries*, 28 Cal.4th at

26   1079-80 ("Historically, 'other insurance' clauses were designed to prevent multiple recoveries

27   when more than one policy provided coverage for a particular loss.  On the other hand, 'other

28   insurance' clauses that attempt to shift the burden away from one primary insurer wholly or

36

1   largely to other insurers have been the objects of judicial distrust.  [P]ublic policy disfavors

2   'escape' clauses, whereby coverage purports to evaporate in the presence of other insurance . . .

3   [T]he modern trend is to require equitable contributions on a pro rata basis from all primary

4   insurers regardless of the type of 'other insurance' clause in their policies" (internal quotations

5   and citations omitted)).

6       The "excess defense" clause in the Clarendon Policies differs from the "excess insurance"

7   provision analyzed in *Century Surety Co.* and *Travelers Casualty & Surety Co.* in that it does not

8   affect the scope of coverage.  While the Century provision purported to make both coverage and

9   the duty to defend "excess" where there was other applicable primary insurance, the Clarendon

10  provision leaves coverage intact, and purports to eliminate only the insurers' defense obligation.

11  Despite this difference, the reasoning of *Century Surety Co.* and *Travelers Casualty & Surety Co.*

12  is equally applicable here.  The excess defense provision found in the Clarendon Policies is a type

13  of "escape clause" – albeit a narrower one than an excess insurance clause – since it allows a

14  primary insurer "to make a seemingly ironclad guarantee" that it will defend the insured, "only

15  to withdraw that [guarantee] . . . in the presence of other insurance." *Century Surety Co.*, 109

16  Cal.App.4th at 1256.  An excess defense clause therefore deprives the insured of the benefit of

17  its bargain.  As the California appellate court held in *Fireman's Fund Ins. Co. v. Maryland*

18  *Casualty Co.*, 65 Cal.App.4th 1279 (1998):

19     "Where two or more primary insurers' policies contain 'other insurance' clauses

20     purporting to be excess to each other, the conflicting clauses will be ignored and

21     the loss prorated among the insurers on the ground the insured would otherwise be

22     deprived of protection.  Thus, although a true excess insurer – one that is solely

23     and explicitly an excess insurer providing only secondary coverage – has no duty

24     to defend or indemnify until all the underlying primary coverage is exhausted or

25     otherwise not on the risk, primary insurers with conflicting excess 'other insurance'

26     clauses can have *immediate defense obligations*." *Id.* at 1304 (citations omitted and

27     emphasis added).

28  Such a result is appropriate since "so far as the insured is concerned, the duty to defend

37

1    may be as important as the duty to indemnify." *Buss v. Superior Court*, 16 Cal.4th 35, 45

2    (1997); see also *Montrose I*, 6 Cal.4th at 295-96 ("The insured's desire to secure the right to call

3    on the insurer's superior resources for the defense of third party claims is, in all likelihood,

4    typically as significant a motive for the purchase of insurance as is the wish to obtain indemnity

5    for possible liability.  As a consequence, California courts have been consistently solicitous of

6    insureds' expectations on this score"); *Woodliff v. California Insurance Guarantee Ass'n.*, 110

7    Cal.App.4th 1690, 1699 (2003) (citing *Buss*).  "An insured buys liability insurance in large part

8    to secure a defense against all claims potentially within policy coverage, even frivolous claims

9    unjustly brought." *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1086 (1993).  It is just

10   as inequitable to permit an insurer to escape its bargained-for obligation to provide this type of

11   protection to the insured as it is to permit the insurer to avoid its obligation to indemnify against

12   an ultimate loss.[86]  An excess defense clause is also inequitable from the standpoint of other

13   insurers who have undertaken to defend the insured.  Like excess insurance provisions, excess

14   defense clauses essentially "attempt to shift the burden away from one primary insurer wholly or

15   largely to other insurers," and must thus "be[ ] the objects of judicial distrust." *Dart Industries*,

16   28 Cal.4th at 1079-80.

17        The California Supreme Court has not yet squarely addressed whether excess defense

18   provisions are unenforceable as a matter of public policy.  Based on *Dart Industries*, 28 Cal.4th

19   at 1079-80, and the California appellate decisions invalidating excess insurance provisions,

20   however, the court concludes that the California Supreme Court would hold that the excess

21   defense provisions in the USF and Clarendon Policies are escape clauses that are against public

22   policy.  For this reason, and because the identical provisions in the USF and Clarendon Policies

23

24

25

26   [86]This is particularly true where, as here, more than one of the insurers obligated to defend
     included an excess defense provision in its policy.  Had USF and defendants been the only
27   insurers on the risk, and had USF, like defendants, elected not to defend based on its excess
     defense provision, Hondo would have been left to pay for its own defense in the Underlying
28   Action, and been denied one of the primary benefits of the insurance coverage for which it paid.

1   are mutually irreconcilable,[87] the court concludes that the proper course is to ignore the excess

2   defense clauses and equitably apportion defense costs among the three insurers.  See *Travelers*

3   *Casualty & Surety Co.*, 118 Cal.App.4th at 1160 ("While generally, an insurer's coverage terms

4   will be honored if possible, there are exceptions to this rule. . . .  One exception arises where the

5   policies of two or more insurers of a common insured, providing primary coverage for the same

6   risk, contain conflicting 'other insurance' clauses . . . if one insurer pays more than its share of

7   the loss or defense costs without participation from the other insurer or insurers, a right to

8   contribution arises. . . .  'The purpose of this rule of equity is to accomplish substantial justice

9   by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting

10   at the expense of others,'" quoting *Fireman's Fund Ins. Co.*, 65 Cal.App.4th at 1293); *Commerce*

11   *& Industry Ins. Co.*, 75 Cal.App.4th at 744-45 (holding that where two insurance policies have

12   the same "excess only" clauses, the costs of defense should be prorated because "[i]f given effect

13   [the] competing clauses would strand an insured between insurers disclaiming coverage in a

14   manner reminiscent of Alphonse and Gaston").

15           **4.      Equitable Contribution**

16           "[T]he right to equitable contribution arises when several insurers are obligated to

17   indemnify or defend the same loss or claim, and one insurer has paid more than its share of the

18   loss, or defended the action without participation by the others."  *Truck Ins. Exchange*, 79

19   ────────────────────────

20           [87]The Golden Bear Policy contains an "other insurance" clause, which provides that when
    its coverage is primary, and "the other insurance is also primary," it "will share with all that
21   other insurance by the [following] method: . . . If all of the other insurance permits contribution
    by equal shares, we will follow this method also.  Under this approach, each insurer contributes
22   equal amounts until it has paid its applicable limit of insurance or none of the loss remains,
    whichever comes first.  If any of the other insurance does not permit contribution by equal shares,
23   we will contribute by limits.  Under this method, each insurer's share is based on the ratio of its
    applicable limit of insurance to the total applicable limits of insurance by all insurers."  (Fact
24   Stip., Exh. 3 (Golden Bear Policy).)  Although it does not specify a single method of
    contribution, Golden Bear's "other insurance" clause requires that defense costs be apportioned
25   in some way among all primary insurers that are on the risk.  Contrary to defendants' assertion,
26   therefore, it is clear that the "other insurance" clause in Golden Bear's Policy directly conflicts
    with the "excess defense" provisions in the USF and Clarendon Policies. (See Defs.' Mot. at 20-
27   21.)

28

                                                      39

1    Cal.App.4th at 974.  The purpose of the rule "is to accomplish substantial justice by equalizing
2    the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense
3    of others."  *Fireman's Fund Ins. Co.*, 65 Cal.App.4th at 1293.  Equitable contribution is
4    "predicated on the common sense principle that where multiple insurers or indemnitors share
5    equal contractual liability for the primary indemnification of a loss or the discharge of an
6    obligation, the selection of which indemnitor is to bear the loss should not be left to the often
7    arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying
8    a just claim in the hope the claimant will obtain full payment from another coindemnitor."  *Id.*
9    at 1295.

10       Citing *Centennial Insurance Co. v. United States Fire Ins. Co.*, 88 Cal.App.4th 105
11   (2001), USF contends that defense costs should be divided on an "equal share" basis, with each
12   of the three insurance companies paying one-third of the total costs.[88]  Defendants argue that the
13   "equal shares" method of allocation does not necessarily apply; they do not identify an alternative
14   formula that the court should employ, however.[89]

15       There is no fixed rule for allocating defense costs among primary insurers covering the
16   same loss.  California courts consider "the varying equitable considerations which may arise . . .
17   and which depend on the particular policies of insurance, the nature of the claim made, and the
18   relation of the insured to the insurers."  *Signal Companies*, 27 Cal.3d at 369; see also *Fireman's*
19   *Fund Ins. Co.*, 65 Cal.App.4th at 1306-07; *Stonewall Ins. Co. v. City of Palos Verdes Estates*,
20   46 Cal.App.4th 1810, 1853-54 n. 14 (1996); *Armstrong World Industries, Inc.*, 45 Cal.App.4th
21   at 52-53; *CNA Casualty of Cal.*, 176 Cal.App.3d at 619-20.  Thus, the exact allocation is a
22   decision that ultimately rests in the discretion of the court.

23       *Centennial Insurance Co.* is not to the contrary.  There, the California appellate court held:
24       "In choosing the appropriate method of allocating defense costs among multiple
25       liability insurance carriers, each insuring the same insured, a trial court must

26   _____

27   [88]Pl.'s Mot. at 20.

28   [89]Defs.' Opp. at 19.

40

1   determine which method of allocation will most equitably distribute the obligation

2   among the insurers 'pro rata in proportion to their respective coverage of the risk,'

3   as 'a matter of distributive justice and equity.'   As such, the trial court's

4   determination of which method of allocation will produce the most equitable results

5   is necessarily a matter of its equitable judicial discretion." *Id.* at 111-12.[90]

6   The court held that the trial court had not abused its discretion by employing the "time on the

7   risk" method of allocation instead of an "equal shares" approach. *Id.* at 112.  Specifically, it

8   concluded that the "time on the risk" method was more equitable under the facts of the underlying

9   case because one of the insurers had only covered the mutual insured for a period of less than six

10  months, "only a small fraction of the total insurance coverage period of four and one-half years

11  provided" to the insured by the other three insurance companies. *Id.* at 113.  To ignore the

12  relative periods of coverage and require each insurer to pay the same amount of defense costs, the

13  court stated, "would have been patently arbitrary and inequitable." *Id.* at 113-14.

14       Similarly here, it would be inequitable to apportion defense costs in equal shares because

15

16  ─────────────────

17  [90]The *Centennial* court identified six methods that California courts have used to apportion
    defense and indemnity costs:

18  "(1) apportionment based upon the relative duration of each primary policy as
    compared with the overall period of coverage during which the 'occurrences'
19  'occurred' (the 'time on the risk' method); (2) apportionment based upon the
    relative policy limits of each primary policy (the 'policy limits' method);
20  (3) apportionment based upon both the relative durations and the relative policy
    limits of each primary policy, through multiplying the policies' respective durations
21  by the amount of their respective limits so that insurers issuing primary policies
    with higher limits would bear a greater share of the liability per year than those
22  issuing primary policies with lower limits (the 'combined policy limit time on the
    risk' method); (4) apportionment based upon the amount of premiums paid to each
23  carrier (the 'premiums paid' method); (5) apportionment among each carrier in
    equal shares up to the policy limits of the policy with the lowest limits, then among
24  each carrier other than the one issuing the policy with the lowest limits in equal
    shares up to the policy limits of the policy with the next-to-lowest limits, and so on
25  in the same fashion until the entire loss has been apportioned in full (the 'maximum
    loss' method); and (6) apportionment among each carrier in equal shares (the 'equal
26  shares' method)." *Id.* at 112-13 (citations omitted).

41

1   Clarendon National insured Hondo for only three months,[91] while USF and Clarendon America

2   each provided coverage for twelve months.[92] Given the particular circumstances of this case, the

3   court finds that allocation according to "time on the risk" would be more equitable and

4   "accomplish substantial justice" among the parties.[93] *Fireman's Fund Ins. Co.*, 65 Cal.App.4th

5   at 1293. It is undisputed that USF incurred a total of $117,429.81 in attorneys' fees, costs, and

6   expert fees defending Hondo in the Underlying Action.[94] Apportioning that expense according

7   to the insurers' time on the risk, the court concludes that Clarendon National is liable for 1/9 of

8   the defense fees and costs, or $13,047.75. Clarendon America is liable for 12/27 of the defense

9   fees and costs, or $52,191.03.

10

11                         **III. CONCLUSION**

12       Having reviewed the record supporting the cross-motions for summary judgment, the court

13   finds that there are no triable issues of fact, and that defendants are entitled to judgment as a

14   matter of law on plaintiff's second and fourth causes of action. The court further finds that

15   plaintiff is entitled to summary judgment on its first and third causes of action.

16

17      [91]Fact Stip., ¶ 3(B) (modified by Joint Notice of Errata to Stipulation of Facts in Support

18   of Cross-Motions for Summary Judgment and/or Adjudication); see *id.*, ¶ 5; see also Defs.'
Facts, ¶ 3(B); Pl.'s Genuine Issues, ¶ 3(B); Pl.'s Facts, ¶ 2.0; Defs.' Genuine Issues, ¶ 2.0.

19

20      [92]Fact Stip., ¶¶ 3(A), 3(C); see Defs.' Facts, ¶¶ 3(A), 3(C); Pl.'s Genuine Issues, ¶¶ 3(A),
3(C); Pl.'s Facts, ¶¶ 1.0, 3.0; Defs.' Genuine Issues, ¶¶ 1.0, 3.0.

21

22      [93]Because the USF, Clarendon America, and Clarendon National Policies have identical
per occurrence policy limits, the "time on the risk" method yields the same ratio as the "combined

23   time on the risk" method of apportionment.

24      [94]Pl.'s Facts, ¶¶ 6.0-6.3; Defs.' Genuine Issues, ¶¶ 6.0-6.3; Defs.' Facts, ¶ 16(A); Pl.'s

25   Genuine Issues, ¶ 16(A). Defendants argue that they should not be compelled to pay a share of
USF's defense costs because their Policies limit their obligation to pay for a defense to counsel

26   selected by them. (Defs.' Mot. at 28.) It is well-settled that an insurer that declines to defend
waives its right to challenge the reasonableness of defense costs. See *Am. Star Ins. Co. v. Ins.*

27   *Co. of the West*, 232 Cal.App.3d 1320, 1332-33 (1991). Having rejected Hondo's tender of
defense, defendants cannot now dispute the reasonableness of the defense costs incurred on the

28   basis that their Policies give them a right to retain counsel of their choice.

1  The court will enter a judgment declaring that:

2      1.     Defendants had no duty to indemnify the parties' mutual insured, and should not,

3             in equity, be required to contribute to indemnification of the insured in the

4             Underlying Action.

5      2.     Defendants had a duty to defend the parties' mutual insured in the Underlying

6             Action.  Clarendon National must pay USF $13,047.75 and Clarendon America

7             must pay USF $52,191.03, as their respective shares of the fees and costs incurred

8             in the defense of the insured in the Underlying Action.

9

10  DATED: February 16, 2006

                             _Margaret M. Morrow_

11                                  MARGARET M. MORROW
                          UNITED STATES DISTRICT JUDGE